Commonwealth of Pennsylvania, Plff. in Err., *v.* Phila-
delphia County.

Since the act of December 12, 1860, the commonwealth cannot recover
from a county the sum actually collected by the latter as state tax on per-

NOTE.—For the powers of the board of revenue commissioners, see Lacka-
wanna County v. Com. 156 Pa. 477, 26 Atl. 1119. For the collection of the
personal property tax, see Com. v. Philadelphia County, 157 Pa. 531, 550,
558, 27 Atl. 546, 551, 553.

sonal property in excess of the sum fixed by the revenue commissioners as the county's quota of such tax.

If the act of May 24, 1878, § 12, re-enacting the provisions of the act of 1860, is unconstitutional because its provisions are not clearly expressed in the title of the act, the act of 1860 is still in force, as the repeal by the act of 1878 was to take effect so far as the acts repealed were supplied.

As to such tax the general principles which govern the relation between principal and agent do not apply, because the relation between the state and the counties is primarily that of debtor and creditor, being so created by statute.

Whenever, in any year, the revenue commissioners have reduced the aggregate valuation of personal property liable to taxation, as returned by the county, the latter is entitled to the state tax collected upon the excess.

The action of the revenue commissioners upon the valuation of personal property, unappealed from, is final; conclusive alike upon the county and the state.

(Argued May 30, 1887.   Decided October 3, 1887.)

May Term, 1887, No. 10, M. D., before GORDON, TRUNKEY, CLARK, GREEN, and STERRETT, JJ.   Error to the Common Pleas of Dauphin County to review a judgment for the defendant in an appeal from the settlement of the auditor general and state treasurer.   Affirmed.

Reported below, 3 Pa. C. C. Rep. 97.

The facts are stated in the finding of the court below by Mc-PHERSON, J., which was as follows:

This case was tried without a jury under the act of 1874. We find the facts to be as follows:

1. The returns of aggregate valuation of personal property liable to state tax, made to the board of revenue commissioners by the county of Philadelphia for the years 1877, 1878, 1879, and 1880, have been lost; and there is not sufficient evidence upon which to find the aggregate amounts contained therein.

2. The minutes of the board of revenue commissioners which state the valuations fixed by them do not contain the valuation returned by the county for these years, and except for the year 1878, the evidence does not show whether or not the action of the board reduced the valuations.   Even for that year it only shows that the board reduced its own valuation.

3. For the year 1887, the valuation fixed by the board made the state tax due from the defendant $164,780.88.   This sum has been paid in full; but for the same year the defendant col-

lected as state tax the sum of $176,084.60, and still retains the excess of $11,303.72.

4. For the year 1878, the valuation fixed by the board, on April 26, 1878, made the state tax due from the defendant $168,-693.41. On July 11, 1878, this valuation was reduced by the board so as to make the said tax $161,375.11. This sum has been paid in full; but for the same year the defendant collected as state tax the sum of $181,191.36, and still retains the excess of $19,816.25.

5. For the year 1879 the valuation fixed, on July 11, 1878, remained unchanged, and the defendant paid in full the tax due thereon, *viz.,* $161,375.11; but for the same year it collected as state tax the sum of $172,907.93, and still retains the excess of $11,532.82.

6. For the year 1880 the valuation fixed by the board made the state tax due from the defendant $214,314.97. This sum has been paid in full; but for the same year the defendant collected as state tax the sum of $218,722.13, and still retains the excess of $4,407.16

The conclusions of law announced by the court below were as follows:

The commonwealth claims to recover these several items of excess, aggregating $47,059.95, and the desirability of putting the dispute to rest has led us to consider some of the positions taken in argument, although, in strictness, the facts do not sufficiently appear. The question to be decided is this: Has the commonwealth a right to recover from the county the sum actually collected by the latter as a state tax on personal property, in excess of the sum fixed by the revenue commissioners as the county's quota of such tax? The commonwealth asserts that the county is to be regarded as a mere agent for collection, and cannot, therefore, successfully deny the right of the state to demand whatever amount the tax may have brought into the county's hands, but we do not think the assertion is borne out by the legislation on this subject; and, therefore, we do not agree with the commonwealth's conclusion. In our opinion the state has no valid claim to the money in suit; and we believe a short examination of the statutes will show this view to be sound.

The general principles which govern the relation between principal and agent, and to which the commonwealth appeals, do

not apply, because the relation between the state and the counties, so far as this tax is concerned, is primarily that of creditor and debtor, so created by statute; and, therefore, the question before us depends in large measure simply on the language of the several acts. If anyone is curious about the earlier legislation on this matter, he will find a few examples in:

Acts of March 27, 1782, 2 Dall. L. 4; March 24, 1786, 2 Dall. L. 438; April 17, 1795, 3 Dall. L. 726; March 25, 1831, P. L. 206 and 211; May 3, 1832, P. L. 417; June 11, 1840, P. L. 612, and § 8 of the act of July 27, 1842, P. L. 444.

From these examples the fact appears, as was indeed to be expected, that the state has dealt with the counties on different principles at different times, now requiring them to pay definite sums or quotas, and again calling for such sums only as they might be able to collect. No doubt that course was adopted which seemed on the whole to be best for the particular occasion; and these illustrations are merely given to support the statement that the question before us is not to be decided so much by abstract reasoning as by the language of the statutes themselves.

In 1844 a new tax law was passed. P. L. 497, *et seq.* By § 36 a board of revenue commissioners was created for equalizing the assessments and taxes, for the use of the commonwealth in the different counties thereof; and by § 38 their duties were defined. They were to ascertain and determine the fair and just value of the property in the city of Philadelphia and the several counties of the commonwealth, made taxable by law, adjusting and equalizing the same as far as possible, so as to make all taxes bear as equally as practicable upon all the property in the commonwealth, in proportion to its actual value; and, after this was done, the valuation thus made was to be and remain as the valuation of the said property till the next meeting of the board.

But, since valuations were to be adjusted and equalized, it was implied that they might be changed; and the question at once arises, What would be the effect of such change? These valuations were originally the work of the local assessors, and came to the board from the several county commissioners in the aggregate, stating only lump sums, and not giving detailed lists of the individual owners and the property valued. The lists remained in the county offices, and with them the revenue commissioners had nothing directly to do. Nevertheless, any change made by the board in the lump sums, upon which alone they were to act,

would indirectly affect the lists of individual owners, for the action of the board in fixing the valuation was to be final, and a copy of its adjustment was to be sent to each county, the commissioners whereof were required to "assess and collect the 'state tax . . . on the amount of the valuation so transmitted.' "

Of course, if the revenue commissioners made no change in the valuation they received, the county commissioners would make none in the individual lists; but in case the board did make a change, what then was to be done with the lists? Section 39 answers this question whenever the change was to increase the valuation in any county, for it expressly directs that the valuations on the individual lists shall then be increased by the proper fraction; but we have found no express answer in this statute, if the change was to decrease the valuation. So far, however, as the commonwealth is concerned, we think other provisions of the act plainly imply that the state, by decreasing the valuation, gave up all claim to tax upon the amount thus taken off. Indeed, the very act of decreasing the valuation would be a surrender of this claim, and a final declaration by its own tribunal that the valuation made by the local authorities was not a fair and just basis for state taxation.

After such a surrender and declaration by the state, upon what ground could it claim the whole sum collected, and thus indirectly set aside in its own favor its own deliberate reduction?

But the implication to which we refer is to be found in § 40. There the relation between the state and the county in regard to this tax is in effect declared to be, not that of principal and agent, but that of creditor and debtor.

The county is made primarily liable for the quota fixed by the revenue commissioners; and it must pay that quota, whether it collects or fails to collect.

This was decided in Schuylkill County v. Com. 36 Pa. 524, and seems to determine the case before us, so far as the act of 1844 is concerned; for, since the state is not directly dealing with the individual taxpayer, but primarily with the county, its claim is, in express language, limited to the quota of the county or the taxes as aforesaid (*i. e.*, by the revenue commissioners) adjusted and assessed; and after such quota has been paid, it would seem to have no further claim. See also New York v. Davenport, 92 N. Y. 604.

What then was to become of any money which might be collected by the county as state taxes upon the amount thus taken off its aggregate valuation by the revenue commissioners? In a complete and logical system of taxation we should not expect to find any such money; we should expect to find a reduction in aggregate valuation, followed by a fractional reduction of the individual lists, just as we find an increase of aggregate valuation, followed by a fractional increase on those lists; but we do not discover in Pennsylvania a complete and logical system, and probably the subject does not admit of that kind of treatment. At all events, it is certain that the abstract reasoner will meet many surprises as he studies the taxing statutes, and must often be content to bear with what is written, without being able to approve or perhaps even to explain. At the point we have reached these remarks may apply.

It seems odd enough that a reduction of aggregate valuation made by the revenue commissioners was not directed to be carried down to the individual lists; but the plain fact is that no such direction appears, and the practical result was that the county commissioners made no reduction which the law did not, in terms, require, and that the county was thus enabled to collect, under the name of state tax, more money than it was obliged to pay out on the same account.

As all state tax went, in the first instance, into the county treasury, the effect was to allow the counties to keep this excess for their own use; and this seems to have been recognized by the state as the true meaning of the law, for with the single exception of Com. v. Herr, 1 Pearson (Pa.) 332, decided 1862, we have been referred to no case for more than forty years in which the state laid claim to the excess thus collected and kept for county use. That case expressly declares the effect of the act of 1844 to have been such as we have described, the learned judge saying: "The act of 1844, constituting the board of revenue commissioners, authorized them to determine the amount 'of state taxes on real and personal property which should be charged against'" each county of the commonwealth.

If less was raised, the difference must be forthwith paid out of any money in the county treasury. If more, it went into the same treasury; and the decision is based entirely on § 17 of the act of 1846 (P. L. 490), which was thought to prescribe a different rule. It would now be necessary to consider this section, if

it was not for the later act of December 12, 1860, P. L. 1861, p. 846.

· This important statute does not seem to have been brought to Judge PEARSON's notice, for it is not referred to in any way, although it seems to be directly in point. We quote the act in full: "Whenever the board of revenue commissioners shall, for the purpose of equalizing taxation in the several cities and counties of this commonwealth, reduce the aggregate valuation of property in such city or county, such city or county may proceed to collect the state tax as fixed by law upon the aforesaid aggregate valuation; and there shall be paid into the state treasury for state purposes the quota of such city or county, based upon such reduced valuation; and the tax levied by reason of the excess valuation merely shall be received by such city or county as county tax and for county purposes; and the provisions of this act shall apply and extend to those cities and counties in which the aggregate valuation of property was reduced by the last board of revenue commissioners, and shall take effect upon the state tax levied and collected by such cities and counties for the present year."

This certainly is plain language, and we have no doubt that if its provisions had not escaped attention, the decision in Com. v. Herr would have been against this particular claim of the state. Whatever, therefore, may be the true meaning of § 17 of the act of 1846, since 1861, at least, the county has been entitled to the state tax upon the excess whenever the revenue commissioners reduced the aggregate valuation. We may add, in passing, that, while the act of 1860 was repealed by § 14 of the act of 1878 (P. L. 129), its provisions were re-enacted by § 12 of the same act, so that their effect has been continuous, and has not been impaired by the formal appeal. And if, as was argued for the commonwealth, § 12 is unconstitutional because its provisions are not clearly expressed in the title of the act, the act of 1860 would still be in force, for the repeal was only to take effect so far as the acts repealed were supplied. Thus, in one form or the other, either as a separate act, or as § 12 of the act of 1878, the provisions of the act of 1860 are still in force, and, as we have already intimated, either recognize as lawful the practice then prevailing, or, at least, make the practice lawful for the future. Therefore, as to the excess collected by the defendant as state tax for any year in which the revenue commissioners may

have reduced the aggregate valuation returned by the county, the act of 1860 is a bar to the present claim of the commonwealth.

There may have been, however, certain years for which the board made no reduction, but for which the defendant collected as state tax more than its quota. What is to be said about this? We do not certainly know the explanation of this peculiar state of things; but, in our opinion, the state, at least, has no claim upon the excess.

The valuations of the county authorities were accepted by the board; all the tax due thereon has been paid by the county to the state, and, upon the facts before us, we do not see how we can go behind the board's adjustment. The county's fraud was suggested on the argument; but it was not proved, and of course we cannot presume it. We are asked in effect to revise the action of the board in this collateral way, and to presume, from the mere fact that an excess exists, that the defendant concealed from the revenue commissioners a part of its aggregate valuation, and afterwards fraudulently collected, for its own use, a tax on the part concealed. We prefer, as indeed we are bound, to presume that there is an honest explanation, and it does not seem to us to be far to seek.

It is reasonably certain that this tangle, like several others which have been a source of trouble, is to be traced to the notorious fact that during many years only a small part of the taxable personal property in the state was assessed, and to the effort by the revenue commissioners to adjust a system, framed to reach and act upon all such property, so as to roughly meet the actual and well-known truth. Such an effort could hardly fail to cause perplexities, and its most prominent result has been to furnish occasion for much vexing litigation and dispute. As an illustration, we may say that the minutes of the board show that in July, 1878, reductions were made in the aggregate valuations, as theretofore fixed, of twenty-five counties, including the defendant, no doubt to bring the state tax down to the absurd limit of $500,000, fixed by § 3 of the act of 1878, and that recovery in this suit would naturally be followed by the opening of the remaining twenty-four accounts.

And this would be the mere beginning of confusion, for the principle contended for would allow the commonwealth to go back to 1844 and overhaul the long-settled accounts of every

county in the state. Indeed, a recovery for any year would seem to demand a general readjustment for that period, for, if the sums fixed by the revenue commissioners were fair and just on the facts before them from time to time, their fairness and justice would be disturbed by recovering now from any one county more than the quota thus allotted, and a general revision would be imperatively called for.

See the case of Com. v. Philadelphia, 14 W. N. C. 371, where an attempt was unsuccessfully made to change the valuation of one county alone, leaving the others untouched.

Further, it seems to us that the purpose of the commonwealth, to require from the counties only the amount of tax fixed by the revenue commissioners, is clearly shown by taking, in one view, § 40 of the act of 1844 and the act of 1860. In effect, the act of 1844 says to the county: The state will take no less from you than the quota fixed by the board; and the act of 1860 says: The state will take no more than that sum.

It is true that the act of 1860 only covers, by its letter, the case of a reduced valuation, because it seems to have been assumed that if the valuation was not reduced, there could be no excess of tax beyond the quota fixed by the board; but the spirit of the two acts is, as we think, that only that quota was, in any case, to be paid by the county to the state. In other words, and laying aside the case of fraudulent returns, the action of the revenue commissioners upon the valuations of personal property, unappealed from, is final, conclusive alike upon the county and the state. Com. v. Butler County, 2 Pearson (Pa.) 421.

Either in letter or in spirit, therefore, the legislation referred to forbids a recovery in this case by the commonwealth; and we accordingly direct the prothonotary to enter judgment for the defendant, if exceptions are not filed, as provided by law.

The commonwealth filed seventeen exceptions which, in so far as they are material, are set forth in the assignments of error.

Upon overruling the exceptions, McPHERSON, J., delivered the following opinion:

The first exception is not sustained. The evidence offered stated a different cause of action from that upon which the statement was founded. The commonwealth's claim was simply to recover the excess of state tax collected by the county beyond the quota fixed by the revenue commissioners, and is based upon

the actual receipt of such excess, while the evidence offered was meant to show that the county's return was incorrect, and, therefore, that the commissioners ought to have fixed the quota at a larger sum. In other words, the commonwealth desired to attack collaterally the action of its own tribunal. This, we think, cannot be done in the case before us. The commissioners have ample power under §§ 2 and 3 of the act of 1876, P. L. 126, to inquire into the correctness of any return; and they are the proper tribunal to decide that question. Having decided, and subject to the right of appeal by the county, that action is conclusive alike upon the county and the state; at least in the absence of fraud, a question upon which we do not now pass. The eleventh, twelfth, fourteenth, and fifteenth exceptions involve the same question as the first.

The second, third, fourth, fifth, and sixth exceptions refer to the first and second findings of fact, and are also overruled. The county's returns were not in evidence; and, considering the power of the revenue commissioners to make changes therein, and its actual exercise, we do not think it follows that the amount fixed by the commissioners is the same as that returned by the county. As we believe, there is no such presumption of fact, for the sufficient reason that no such uniform course of dealing on the part of the commissioners is shown as would support the presumption. Nor were the alleged facts admitted by the county; but, on the contrary, some of them, at least, were expressly denied upon the argument.

The tenth and thirteenth exceptions refer to a question not raised by the evidence.

As to the sixteenth, it is enough to say that the decision is not based in any degree upon the matter supposed, which is merely put forward as a statement of certain difficulties in plain view, if the commonwealth's claim were sustained, and, therefore, as an argument from inconvenience against the soundness of its position. The decision would have been the same if no other county than Philadelphia had been likely to be affected.

The seventh, eighth, ninth, and seventeenth exceptions question the conclusions of law, and need no further discussion than is contained in the former opinion.

The exceptions are overruled, and judgment is directed to be entered in accordance with the opinion previously filed.

The assignments of error were as follows:

I. The court below erred in excluding evidence showing that the returns made by the county of Philadelphia of taxable property for the years 1877 to 1880, inclusive, were, and each of them was, grossly below the actual assessments; also, in dismissing the first exception to the decision, being in the words of this assignment.

II. The court below erred in deciding as set forth in exception 2 to the finding, and in dismissing said exception, which was as follows:

"2. The learned court erred in deciding that there was not sufficient evidence upon which to find the aggregate amounts contained in the returns of aggregate valuations of personal property liable to state tax, made to the board of revenue commissioners by the county of Philadelphia for the years 1877, 1878, 1879, and 1880."

III. The court below erred in deciding as set forth in exception 3 to the finding, and in dismissing said exception, which was as follows:

"3. The learned court erred in deciding that the minutes of the board of revenue commissioners, which state the valuations fixed by them, do not contain the valuations returned by the county for these years."

IV. The court erred in deciding as set forth in exception 4 to the finding, and in dismissing said exception, which was as follows:

"4. The learned court erred in not deciding that the said valuations returned by the county of Philadelphia for said years were as follows: For 1877, $164,780.88; for 1878, $168,693.-41; for 1879, $168,693.41; for 1880, $214,314.97."

V. The court erred in not deciding as set forth in exception 5 to the finding, and in dismissing said exception, which was as follows:

"5. The learned court erred in not so deciding, particularly in view of the absence of evidence given or offered to show any reduction or change by the board of revenue commissioners from the amounts returned (except the changes found by the court); and in the absence of evidence of action, the presumption is that none was taken."

VI. The court erred in not deciding as set forth in exception 6

to the finding, and in dismissing said exception, which was as follows:

"6. The learned court erred in not so deciding, in view of the fact that the sums mentioned in the fourth exception appear in part in the specifications of appeal, were referred to in argument by counsel on both sides, and were substantially admitted and treated as correct by counsel on both sides."

VII. The court erred in not deciding as set forth in exception 7 to the finding, and in dismissing said exception, which was as follows:

"7. The learned court erred in deciding that the general principles which govern the relations between principal and agent, and to which the commonwealth appeals, do not apply to this case, because the relation between the state and the counties, so far as this tax is concerned, is primarily that of debtor and creditor."

VIII. The court erred in not deciding as set forth in exception 8 to the finding, and in dismissing said exception, which was as follows:

"8. The court erred in deciding that the state has no claim on the excess of state taxes collected by the defendant, above the quota assigned by the board of revenue commissioners, where the said board has made no reduction from the valuation of said taxable property as returned by the county, but fixed the amount of said quota at the amount returned."

IX. The court erred in not deciding as set forth in exception 9 to the finding, and in dismissing said exception, which was as follows:

"9. The court erred in deciding that the effect of the acts of 1860 and 1878, giving to the respective counties the amount of the reduction of state taxes made by the board of revenue commissioners, was to give to the counties taxes collected as and for state taxes, when there had been no reduction or remission by the said board."

X. The court below erred in deciding as set forth in exception 10 to the finding, and in dismissing said exception, which was as follows:

"10. The court erred in so deciding with respect to the taxes for those years in which mortgages, etc., were exempt from local taxation."

XI. The court erred in not deciding as set forth in excep-

tion 11 to the finding, and in dismissing said exception, which was as follows:

"11. The court erred in so deciding, where the return on taxable property made by the county was grossly erroneous, incorrect, and so far lower than the actual assessments, as to raise a presumption of fraud."

XII. The court erred in not deciding as set forth in exception 12 to the finding, and in dismissing said exception, which was as follows:

"12. The court erred in deciding that the gross discrepancy between the actual assessments and the return of taxable property made to the board of revenue commissioners is no evidence of fraud, and that fraud was not proved."

XIII. The court erred in not deciding as set forth in exception 13 to the finding, and in dismissing said exception, which was as follows:

"13. The court erred in deciding that the county may assess and collect taxes as and for state taxes, partially on subjects not subject to taxation except for state purposes, and may retain a part thereof beyond the commissions, etc., allowed by law, for its own use."

XIV. The court erred in not deciding as set forth in exception 14 to the finding, and in dismissing said exception, which was as follows:

"14. The court erred in so ruling, where it appeared that the amount fixed by the board of revenue commissioners was based upon grossly incorrect returns."

XV. The court erred in not deciding as set forth in exception 15 to the finding, and in dismissing said exception, which was as follows:

"15. The court erred in deciding that the county could even avail itself of a reduction made by the board of revenue commissioners, where such reduction was based upon a gross, insufficient return, as aforesaid."

XVI. The court erred in not deciding as set forth in exception 16 to the finding, and in dismissing said exception, which was as follows:

"16. The court erred in basing its decision, in part, on the confusion resulting from the opening of accounts in other counties, there being no evidence before the court that any other

county whatsoever had collected any state taxes for which it had failed to account, or had made any false returns of assessments."

XVII. The court erred in not deciding as set forth in exception 17 to the finding, and in dismissing said exception, which was as follows:

"17. The court erred in directing judgment to be entered for the defendant, if exceptions are not filed," etc.

*J. Howard Gendell* and *W. S. Kirkpatrick,* Atty. Gen., for the commonwealth, plaintiff in error.—The county, in collecting state taxes, acts as agent for the state.

It is conceded that the claim against the several counties is a tax. An assessment is an essential prerequisite to the collection of a tax. Com. v. Philadelphia, 14 W. N. C. 373.

The act of 1844, § 174, provides that "all personal property," etc., "shall be valued and assessed, and subject to taxation for all state and county purposes whatever." Section 34 directs the county commissioners to assess for the use of the commonwealth the tax therein mentioned. The act of 1846 likewise requires the commissioners to assess for the use of the commonwealth. The acts of 1879 and 1881 likewise direct that "mortgages, etc., . . . shall be and are hereby taxable for state purposes." The various acts require an assessment of the state tax on real and personal property. The tax is levied on the property itself, while in the hands of the individual citizen, and not on the county, and is levied for the use of the commonwealth as a state tax. The county assesses, levies, and collects the tax, but not in its own name; it is collected as a state duty. The subjects of taxation are kept distinct; real estate, for instance, is not now taxable for state purposes, while, on the other hand, mortgages, etc., are not taxable for any other than state purposes.

There is, therefore, a radical difference between this case, and a requisition by the government on a subordinate sovereign or a political subdivision of the country.

The state revenue board cannot make a requisition on the county for such sum as is equitable and just. It can only require the payment of sums duly assessed on the private citizen; and the only power the board has is to equalize the rate of assessment in the different counties. It cannot require money to be paid out of general taxes of other funds. Com. v. Philadelphia, 14 W. N. C. 371.

Another element showing that the money was collected on account of the state, and not as the private money of the county, appears in § 40 of the act of 1844, which requires the county treasurer to pay over the same as fast as collected to the state treasurer.

In order to quicken the action of the county officers, the section provides that if the quota of any county be not paid by a time named, the amount remaining unpaid shall be charged against the county, and paid out of any money in the treasury. The effect of this provision is to make the county liable, as principal debtor. Schuylkill County v. Com. 36 Pa. 524.

There is no machinery whatever by which the state can deal directly with its taxpayers; it must, of necessity, deal through the county officers; and there is, therefore, greater necessity than usual for holding the agent to a strict performance of the duties, and it is, moreover, necessary that the state be able to count with some degree of certainty on the receipts. But all this does not change the nature of the relationship.

An agent (like a trustee or any other person acting in a fiduciary capacity) can never make a profit through his agency. Story, Agency, §§ 207, 214, 217.

Even if some of the taxes had (as alleged, but not proved) been erroneously assessed, the agent who collected them for the principal could not question the principal's title. Story, Agency, § 217; State v. Tumey, 86 Ind. 559; Woodward v. State, 103 Ind. 127, 2 N. E. 321.

At all events, the liability is fixed by the act of 1846.

The act of 1846, § 17, P. L. 490, expressly provides that any excess over the valuation shall not be exempt from taxation for state purposes, but that the valuation shall be treated as a minimum below which the assessments shall not descend.

In Com. v. Herr, 1 Pearson (Pa.) 328, the county of Lancaster was held liable for the entire collections in excess of the valuation.

This act is not repealed by § 14 of "an act defining the powers and extending the duties of the board of revenue commissioners" approved May 24, 1878, P. L. 129. That act relates exclusively to the duties of the revenue board. Under it, as under the earlier acts, the board cannot add or consider new subjects of taxation or add new property; it can only consider whether the same rate

or proportion of assessment to actual value was applied in each county. Com. v. Philadelphia, 14 W. N. C. 371.

The enactment (if the repealing clause has that effect) that. the county may retain for its own use taxes collected for the state in excess, not only of the quota assigned by the revenue board, but also in excess of its own return, and that this would apply to taxes for back years, is not, as required by the Constitution, so clearly expressed by the title that a person reading the title would be put on his guard. It is a claim against the county with which the revenue board had no concern; yet, according to the title, the act merely defined their powers and extended their duties.

In Union Pass. R. Co.'s Appeal, 81* Pa. 91, it was held that in an act, the title to which gave authority to lay additional tracks of railway, authority could not be given to lay tracks on streets not mentioned in the original charter. See also Ruth's Appeal, 10 W. N. C. 498, which seems to go beyond the requirements of this case.

'The repeal operates only so far as the act of 1846, § 17, is thereby supplied, *viz.,* as to the taxes for future years in which the board acts, and, so far as § 12 gives to the county the amount of the reduction in valuation, it is a repeal *sub modo* only. In other words, it prevents the recovery from the county of those taxes, which, by § 12, are distinctly given to the county, *viz.,* the taxes on the reduction of the valuations.

While the acts of 1844 and 1846 provide a course to be adopted when the valuations are increased by the revenue commissioner, *viz.,* a proportionate division of the increased tax among the taxpayers, yet no provision is made for a reduction. Unless, therefore, the county officers of their own will reduced all the valuations in their county, the inevitable result is a surplus of state taxes. In view of the fact that the same property was, as a general rule, subject to local taxation, such a reduction might be very inexpedient. Accordingly, the act of December 12, 1860, § 1, P. L. 1861, p. 846, provides that "whenever the board of revenue commissioners shall, for the purpose of equalizing taxation in the several cities and counties of this commonwealth, reduce the aggregate valuation of property in such city or county, such city or county may proceed to collect the state tax, as fixed by law, upon the aforesaid aggregate valuation, and there shall be paid into the state treasury, for state purposes, the quota of

such city or county, based upon such reduced valuation, and the tax levied by reason of the excess valuation merely shall be received by such city or county as county tax and for county purposes."

The act of 1878, § 12, is in substantially the same language. It applies only when the board reduce valuations for the purpose and in the manner mentioned, and to the extent of the reduction in valuation only. It is simply to prevent the injustice of unequal taxation in different counties, by reason of difference in valuations, on the one hand, and of the embarrassment from the absence of provision for carrying the reduction by the revenue board down to the individual taxpayer, on the other hand.

The returns for the years 1877 to 1880 have been lost. The court finds that "there is not sufficient evidence upon which to find the aggregate amounts contained therein."

But the revenue board kept minutes, which, by agreement, were treated as in evidence. Those minutes show a reduction, in 1878, from a definite sum to another definite sum.

We claim the entire collection, less payments. The county sets up as a defense the acts of 1860 and 1878, presenting the county with the tax on the reduction of valuation.

The correctness of the account, as settled, is not disputed by any of the specifications of appeal; and the appellant below is restricted to those specifications. Porter v. Com. 1 Penr. & W. 252; Com. v. Porter, 21 Pa. 385.

So far from this, no reduction for 1877 and 1880 is set up there, and the reduction found by the court is set up for 1878 and 1879, in specifications which directly state the amount of the return. This is conclusive.

There can be no question respecting the form of the remedy. If money collected by the county belongs to the state, the county is a public debtor against whom an account may be settled. Philadelphia v. Com. 52 Pa. 451.

*Charles F. Warwick,* City Solicitor, and *James W. M. Newlin,* for defendant in error.—This case was tried in the court below under the act of 1874, without a jury. The findings of fact are, therefore, conclusive, and cannot be reviewed in the supreme court. Jamison v. Collins, 83 Pa. 359; Lee v. Keys, 88 Pa. 175; Brown v. Dempsey, 95 Pa. 243; Bradlee v. Whitney, 108 Pa. 366.

The collections in excess of the revenue board's equalization belong to the counties by statute. The act of 1844 was so construed in Com. v. Herr, 1 Pearson (Pa.) 332.

The act of 1846 was therein held to require the excess to be paid to the commonwealth.

The act of December 12, 1860, P. L. 1861, p. 846, gave the excess to the counties.

The act of May 24, 1878, § 14, P. L. 129, not only gives the excess to the counties, but expressly repeals the acts of 1846 and 1860.

The commonwealth's argument, as well as its claim, is based upon the totally erroneous supposition that the county is a collecting agent for the state, and is simply the intermediary between the commonwealth and the individual taxpayer. Such is not the case at all, and never has been, either in this state or any other state in the Union.

These municipalities bear the same relation to the state that the great feudatories bore to the Crown, or which, in the Roman Empire, the provinces stood to the Empire.

In all cases where the commonwealth in collecting taxes on personal property deals directly with the counties and makes them responsible for all deficiencies, the county becomes a principal debtor, and is directly taxed for such a sum of money as the state board may assess to it as its quota for a fixed period, to wit: for the current year, or for a longer period in some states. True the quota is fixed with reference to what the county will probably be able to collect from the taxpayers, but in all the states in which this system is pursued it will be seen that the whole theory of county taxation consists in devising a means whereby the state may rely, with absolute security, upon receiving from each county on or before a fixed day in each year a certain definite sum of money, which the state treasurer may rely upon having as a basis of disbursement. Schuylkill County v. Com. 36 Pa. 534.

In New York v. Davenport, 92 N. Y. 604, it was held that losses from taxes for state purposes assessed in the city of New York, but not collected, were to be borne by the city and not the state, which is entitled to the full amount.

The auditor general and state treasurer have no jurisdiction, under the act of 1811, to ascertain the amount payable for state tax on personal property, by any county of the commonwealth;

and they are bound by the action of the board of revenue commissioners, which board alone has any jurisdiction in the premises. Indeed, the annual settlements of account against counties made by the auditor general and state treasurer are unnecessary, and not warranted by the act of 1811.

When that act was passed the revenue of the state was collected from individuals through the agency of various public officers. The state had no fiscal relations with the counties in their political capacity. The county treasurer and other public officers who were the agents of the state in collecting taxes from individuals were collectors only; they were not liable to the commonwealth for taxes which it was impossible to collect; and, therefore, all deficiencies fell upon the state, and of course the gross collections were payable to the state.

The act of 1811, § 1, specifies the accounts which shall be settled under it: "All accounts between the commonwealth and any person or persons, body politic or corporate, as well those with the officers of the revenue as other persons intrusted with the receipt, or who have or hereafter may become possessed of public money."

Now a county is neither a person nor a body politic or corporate, nor an officer of the revenue. A county is a political organization, is a part of the state itself, created purely for governmental purposes, and until the passage of the act of 1844 was not a taxpayer.

In 1844, the state government being in great financial distress, the act of April 29 of that year was passed, with a view of providing the commonwealth with an increased revenue and to make that revenue, or a part of it, absolutely secure; and that the treasury might count with certainty upon the receipt of specified sums for each year, the act of 1844, P. L. p. 497, gave to the revenue board the power of assessing a lump sum or quota upon each county, and made it obligatory upon the county to pay this sum into the treasury, by July 31 of the current year.

By § 38 of the act of 1844, the assessment of the revenue board became the maximum of state taxation, the act saying that the valuation of the board should be and remain until the next meeting of the board.

Section 17 of the act of April 22, 1846, P. L. p. 486, made the assessment of the revenue board a minimum for state taxation. It was doubtful under the act of 1844 whether any excess

could be collected from the individual taxpayer. This act simply validated the tax on the increase, but did not direct its payment into the state treasury.

The act of 1878 declares that the revenue board's valuation shall show the amount with which each city and county is chargeable until the next meeting of the board.

Taking this provision in connection with § 12 of the act of 1878, which provides that where the revenue board reduces the county's own return the tax on the excess shall belong to the county, we surely have a legislative expression of will that the revenue board's quota shall finally determine what the county shall pay to the state for a given period, and that any excess shall belong to the county.

Section 12, considered in its relation to § 17 of the act of 1846, makes it plain that all that the legislature meant by the act of 1846 was to legalize the collection of the state tax on all assessments above the revenue board's valuation, and not that the excess should be paid into the state treasury; but whichever view is correct it is fatal to the commonwealth, as no portion of this alleged excess appears to have been collected while the act of 1846 was in force. The legislature sends its mandate to the counties to collect and pay into the treasury the quota fixed by the revenue board, and that is the end of the matter as between the state and the counties. The legislature says: If you collect any less, that is your loss, and if you collect any more, it is not the commonwealth's gain.

Even had the act of 1811 given express power to the auditor general to ascertain the amount due for tax on personal property, such power would have been done away with by the acts of 1844 and 1878. These acts by clear implication preclude the advancement of any such contention after the date of their enactment.

When the legislature forms a system of taxation, that system operates to the exclusion of all previous inconsistent methods.

An act imposing a collateral inheritance tax is repealed by a later act imposing taxes for the support of the government, although the latter contains no repealing clause. Fox v. Com. 16 Gratt. 1; Cooley, Taxn. 2d. ed. p. 295.

A statute which provides a general scheme for assessing and taxing the property of railroad and telegraph companies as a whole, and for distributing it ratably among the different coun-

ties and their several precincts, townships and districts according to the number of miles of line in each, repeals as to such property a power conferred upon the authorities of a city to make provisions for the assessment of the taxes which they were authorized by other provisions of the city charter to assess and collect. Union P. R. Co. v. Cheyenne, 113 U. S. 516, 28 L. ed. 1098, 5 Sup. Ct. Rep. 601.

No property can be taxed until the law-making power authorizes and requires it to be done; and if it be done in one or in a particular way, that alone can be pursued. It cannot be done in another. Tallman v. Butler County, 12 Iowa, 534; Chicago, R. I. & P. R. Co. v. Davenport, 51 Iowa, 454, 1 N. W. 720.

As the acts relating to the board of revenue commissioners were for the purpose of securing greater equality of taxation, as well as for the security of the taxpayer, they are mandatory, and must be followed.

A provision in a statute providing that no apportionment of values should be made by the auditor until after the equalization by the board of equalization is mandatory and if disobeyed would avoid the tax. All directions given in the statutes concerning the levy and assessment of taxes ought to be substantially followed by courts and officers charged with the duties. They would not be enacted if this were not the intention of the law-making power. State Auditor v. Jackson County, 65 Ala. 142.

All those measures which are intended for the security of the citizen for insuring an equality of taxation, and to enable everyone to know with reasonable certainty for what polls and for what real and personal estate he is taxed, and for what all those who are liable with him are taxed, are conditions precedent; and if they are not observed, he is not legally taxed. Torrey v. Millbury, 21 Pick. 64; Young v. Joslin, 13 R. I. 677; French v. Edwards, 13 Wall. 506, 20 L. ed. 702.

Any affirmative statute is a repeal by implication of a previous affirmative statute, so far as it is contrary thereto, for *leges posteriores priores abrogant.* Com. v. Cromley, 1 Ashm. (Pa.) 181.

A subsequent statute revising the subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must operate to repeal the former to the extent to which its provisions are revised and supplied. Bartlet v. King, 12 Mass. 545, 7 Am. Dec. 99.

Where an affirmative statute introduces a new law or gives a new right, and it appears to be the intention of the legislature that the new law alone shall be followed, or that a right which previously existed should be merged in the one newly created, the latter statute will act as a repeal of the earlier as implying a negative. Harcourt v. Fox, 1 Shower, 506–520; O'Flaherty v. M'Dowell, 6 H. L. Cas. 142; Wilberforce, Statute Law, 328–330.

The moiety act passed by Congress June 22, 1874, was designed to cover the whole ground of frauds on the revenue in the entry of imported goods at the custom house, embracing the punishment of offenders criminally, as well as indemnity to the government; and therefore it was held to supersede, by implication, the different provisions of §§ 2839 and 2864 of the Revised Statutes, U. S. Comp. Stat. 1901, p. 1904, on the same subject. United States v. Auffmordt, 19 Fed. 893.

Later and more specific statutes as a general rule supersede the former and more general statutes, so far as the new and more specific provisions go. Isham v. Bennington Iron Co. 19 Vt. 230.

Where a statute gives a new power, and at the same time provides the means of executing it, those who claim the power can execute it in no other way. Andover & M. Turnp. Corp. v. Gould, 6 Mass. 40, 4 Am. Dec. 84.

Although a subsequent statute is not repugnant in all its provisions to a prior one, yet if it was fairly intended to prescribe the only rules which should govern, it repeals the prior one. Daviess v. Fairbairn, 3 How. 636, 11 L. ed. 760.

An affirmative statute is a repeal by implication of a prior affirmative statute, so far as it is contrary thereto. Sullivan v. People, 15 Ill. 233.

The grant of authority by the legislature to county commissioners, to create a debt and to provide for the payment of the interest thereon, is an enlargement of the power to assess taxes to meet the demand, and an implied repeal of any conflicting statutory limitations. Com. ex rel. Armstrong v. Allegheny County, 40 Pa. 348.

In case of two statutes relating to the same subject, and not in terms repugnant or inconsistent, if the latter statute is clearly intended to prescribe the only rule which shall govern in the case, this will be construed as repealing the original act. Sacramento v. Bird, 15 Cal. 294.

When a special law, local or restricted in its operation, is positively repugnant to a former general law relating to the same subject-matter, and is not merely affirmative, cumulative or auxiliary, the special law repeals the general by implication to the extent of the repugnancy within the limits to which such special law applies. State, North Hudson County R. Co. Prosecutors, v. Kelly, 34 N. J. L. 75.

On this principle, a statute revising the whole subject-matter of a former law repeals it. Thorpe v. Schooling, 7 Nev. 15.

Although repeals by implication are not favored and are not allowed, save where inconsistency is plain and unavoidable, yet a subsequent statute making a different provision on the same subject is not to be construed as an explanatory act, but an implied repeal of the former, so far as the provisions are incompatible with each other. People *ex rel.* Navano v. Van Nort, 64 Barb. 205.

An amendment of another law may operate as a repeal of the original law, or it may not. If an amendment does not change the original law, but simply adds something to it, the amendatory law does not operate as a repeal of the old law. Where an amendment is made that changes the old law in its substantial provisions it must, by a necessary implication, repeal the old law so far as they are in conflict. And where a new law, whether it be in the form of an amendment or otherwise, covers the whole subject-matter of the former, and is inconsistent with it, and evidently intended to supersede and take the place of it, it repeals the old law by implication. Longlois v. Longlois, 48 Ind. 60.

A subsequent statute revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, operates as a repeal of the former. State *ex rel.* Flack v. Rogers, 10 Nev. 319.

A statute is repealed by the enactment of another one repugnant to it, or of one covering the whole subject of the former. United States v. Barr, 4 Sawy. 254, Fed. Cas. No. 14,527.

Without any words of express repeal, a later statute repeals repugnant statutes in an earlier one; and if the later one is evidently intended as a substitute for the earlier one, it will be treated as repealing it as an entirety, although all the provisions of the two may not be repugnant. Excelsior Petroleum Co. v. Embury, 67 Barb. 261.

An amendment operates as a repeal, so far as it is repugnant

to the original act; and if not repugnant in express terms, it still effects a repeal if it covers the whole subject of the amended act and contains new provisions showing that it was meant as a substitute. Breitung v. Lindauer, 37 Mich. 217.

It is said the repeal of the act of 1846 is ineffective, because the title of the act of 1878 does not mention it.

In Com. v. Butler County, 2 Pearson (Pa.) 421, it was contended that this very title was insufficient.

But PEARSON, P. J., who thought the act did not take away the right of trial by jury, said: "There is certainly but one subject contained in this title; and the provisions of the bill are no broader. They may go into some details, and prescribe the mode of enforcing its execution or obtaining relief. The statute we consider strictly constitutional. It is intended to form a system."

The contemporary construction placed by all departments of the state government on the question of its relations with the counties is fatal to the commonwealth's claims.

An act of Pennsylvania of 1715 provided for acknowledgment of deeds before justices of the peace. A practice prevailed to acknowledge them before judges of provincial supreme court. After a lapse of many years, held to be a correct exposition of the statute, although the provincial and state courts had never so ruled in any reported case. M'Keen v. Delancy, 5 Cranch, 32, 3 L. ed. 28.

But the executive branch of the government is bound to give effect to the laws which regulate its duties. And where this necessarily requires a construction of those laws, and such a construction has been acted on for a great number of years under the sanction of the law-making power, it becomes a serious question how far the the judicial can or should interfere. United States v. Lytle, 5 McLean, 17, Fed. Cas. No. 15,652.

Although practical construction cannot be admitted as controlling, it is not to be overlooked, and perhaps should be regarded as decisive in a case of doubt or where the error is not plain. Union Ins. Co. v. Hoge, 21 How. 66, 16 L. ed. 68.

The usage and practice under a statute may be resorted to, in case of doubtful meaning, as a means for ascertaining the intent of the lawmaker. Kernion v. Hills, 1 La. Ann. 419; United States v. Pugh, 99 U. S. 269, 25 L. ed. 323; Edwards v. Darby,

12 Wheat. 210, 6 L. ed. 604; Hahn v. United States, 14 Ct. Cl. 317.

PER CURIAM:

We affirm this case on the opinion of the learned judge of the court below.

Judgment affirmed.